**<u>NOT FOR PUBLICATION</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| KRYSTAL A. UNDERWOOD, | HONORABLE KAREN M. WILLIAMS |
| Plaintiff, | |
| v. | Civil Action<br>No. 22-2268 (KMW-SAK) |
| CAMDEN COUNTY OFFICE OF THE SHERIFF, *et al.*, | **OPINION** |
| Defendants. | |

APPEARANCES:

THOMAS J. GOSSE, ESQ.
126 WHITE HORSE PIKE
HADDON HEIGHTS, NJ 08035

 *Counsel for Plaintiff Krystal A. Underwood*

ANDREW S. BROWN, ESQ.
WILLIAM F. COOK, ESQ.
BROWN & CONNERY, LLP
360 HADDON AVENUE, P.O. BOX 539
WESTMONT, NJ 08108

JAMES PATRICK CLANCY, ESQ.
BROWN & CONNERY, LLP
6 NORTH BROAD STREET
WOODBURY, NJ 08096

 *Counsel for Defendants Camden County Office of the Sheriff, Camden County Office of the*
 *Sheriff Emergency Response Team, Brad Boehly, Mark Kenmer, Zachary Kolins, Michael*
 *McNamee, Scot Mennel, Robert Plews, Donald Souder, David Wright, Camden County*
 *Prosecutor's Office, Joseph Miller*

CHRISTINE A. BARRIS, ESQ.
OFFICE OF THE ATTORNEY GENERAL
25 MARKET STREET, P.O. BOX 116
TRENTON, NJ 08625

*Counsel for Defendants Andrew Austin, Stephen Bezich, Sal Russomanno,*

CHRISTOPHER M. WOLK, ESQ.
BLUMBERG & WOLK, LLC
158 DELAWARE STREET, P.O. BOX 68
WOODBURY, NJ 08906

*Counsel for Defendant Detective Jason Harmon, Cherry Hill Police Department*

STEVEN K. PARNESS, ESQ.
METHFESSEL & WERBEL
2025 LINCOLN HIGHWAY, SUITE 200
EDISON, NJ 08818

*Counsel for Defendant Michael Higgins*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

Plaintiff Krystal A. Underwood ("Plaintiff") brings this action against Defendant Michael Higgins ("Defendant Higgins"); Defendants Camden County Office of the Sheriff ("CCSO"), Camden County Office of the Sheriff Emergency Response Team ("SERT"), Boehly, Kemner, Kolins, McNamee, Plews, Souder, and Write (collectively "CCSO Defendants"); Defendants Camden County Prosecutor's Office, Austin, Bezich, Russomanno, Detective Miller (collectively "CCPO Defendants"); and the Cherry Hill Police Department ("CHPD") and Detective Harman (collectively "CHPD Defendants"), alleging that each Defendant contributed to the violation of Plaintiff's constitutional rights, 42 U.S.C. § 1983, the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 *et seq.*, violations of common law, and the emotional and psychological injuries Plaintiff sustained on February 28, 2020, when her apartment was entered by the SERT officers while they were executing a search warrant on the premises 308 Walnut Avenue, Gloucester City, New Jersey.

This matter comes before the Court on each of Defendants' Motions for Summary Judgment. (ECF Nos. 62, 63, 64, 65). Plaintiff opposes all motions, (ECF Nos. 68, 73, 74, 75), and Defendants replied. (ECF Nos. 76, 77, 78, 79). Separately, Defendant Higgins opposed Defendant CHPD's Motion for Summary Judgment (ECF No. 69), and Defendant CHPD did not reply. For the reasons that follow, Defendant Higgin's Motion for Summary Judgment (ECF No. 62) is denied, CCSO Defendants' Motion for Summary Judgment (ECF No. 63) is granted, CCPO Defendants' Motion for Summary Judgment (ECF No. 64) is granted, and CHPD Defendants' Motion for Summary Judgment (ECF No. 65) is granted.[1]

---

[1] Pursuant to Local Civil Rule 78.1(b), this motion will be decided on the papers without oral argument.

## II.    BACKGROUND

In November of 2019, Plaintiff moved into the unit on the second floor of 308 Walnut Avenue, Gloucester City, NJ 08030. Def. CCSO, Motion for S.J., SMF ("CCSO SMF") ¶ 1. In February of 2020, Defendant CHPD and Defendant CCPO began investigating the distribution of marijuana, then a controlled dangerous substance. Def. CCPO, Motion for S.J. SMF ("CCPO SMF") ¶¶ 14-15. Reports from an informant suggested that the suspect resided at 308 Walnut Avenue. *Id.* An undercover purchase was conducted at the property, as well as drive-by surveillance conducted by Defendant Plews of the SERT team, and Defendant Miller of the CCPO. CCPO SMF ¶¶ 17-19. Defendant Miller performed additional research on the property to prepare for an application for a search warrant and used a website called "NJParcels.com" to confirm details about the property, namely, whether it was a single or multifamily unit. CCPO SMF ¶ 20; CHPD SMF ¶ 44. The search warrant described 308 Walnut Avenue as a "single-family home with off-white color siding" with a single "white screen door" and a black mailbox to the right of this door. CCSO SMF ¶ 8. On February 27, 2020, the search warrant was signed and approved as a "no-knock" warrant and the SERT team executed the warrant at 308 Walnut Ave the following day. CCPO SMF ¶¶ 22-23.

At approximately 6:00 AM on February 28, 2020, the SERT team entered the property through the front door, cleared the first floor area, and did not find the suspect. CCPO SMF ¶¶ 25-26; Defendant CHPD, Motion for S.J. SMF ("CHPD SMF") ¶ 21; CCSO SMF ¶ 20. The SERT team had information that led them to believe that the target was supposed to be at home, causing the team to expand their search for the suspect. CHPD SMF ¶ 18; CCSO SMF ¶¶ 21-24. A second locked door was found outside on the side of the building. CCSO SMF ¶ 24. The SERT team contacted Defendant Plews and Defendant Miller, the warrant affiant, to determine if the team

could breach this door. CCSO SMF ¶¶ 26-27. It was confirmed by Defendant Plews that the warrant applied to the entire structure. *Id.*; CHPD SMF ¶ 20. The SERT team breached Plaintiff's front door and discovered Plaintiff in bed in a state of partial undress, permitting her to put on a sweater before being placed in zip ties until they finished their search. CCPO SMF ¶¶ 34-35; CHPD SMF ¶ 11; Plaintiff's Opposition to Def. CHPD Motion for S.J. Supplemental Statement of Fact ("Pl. Opp. CHPD SMF") ¶¶ 147-151. Plaintiff notes that the testimony regarding how long the search was is inconsistent among the officers, noting that while some officers believe the search was quick, Detective Miller testified that the search of the two apartments took between thirty and forty five minutes. Plaintiff's Opposition to Def. CCSO Motion for S.J. Supplemental Statement of Fact ("Pl. Opp. CCSO SMF") ¶ 86. Plaintiff further asserts that the officers behaved in an aggressive manner, intimidating her and causing her pain when she was restrained, and that the officers did not affirmatively release Plaintiff from the zip ties but had to be chased down after they left Plaintiff's unit. Pl. Opp. CCSO SMF ¶¶ 84-85, 87-88.

Defendants and Plaintiff dispute as to whether the physical attributes of the home, both observed on the day, through previous surveillance, and information from Defendant Miller's research, were sufficient to indicate to the officers involved that the home itself was not a single occupancy home, but in fact a duplex. Defendant Higgins Statement of Material Facts ("HIG SMF") ¶¶ 4-8. Specifically, 308 Walnut Avenue was registered with the City of Gloucester Building Department as a duplex, there were two separate doors to each unit, painted different colors, with two separate mailboxes adjacent to each door, and two electrical meters outside of the home. *Id.* ¶¶ 4-8, 31.[2] There is no internal staircase or passage to connect the two units. *Id.* ¶¶

---

[2] Defendants argue that the electrical meters were not visible or viewed by them at any point during their surveillance or presence at the home, Defendant Higgins and Plaintiff assert that they were visible at least on the day of the search warrant's execution. CHPD SMF ¶¶ 55, 59; HIG SMF ¶ 31; Pl. Opp. CHPD SMF ¶ 134.

29-30. All parties agree that there was no signage to indicate that the residences were two separate units, *i.e.* labels "A" and "B" or "1" and "2" on the individual doors, nor were there any names or distinguishing symbols on the mailboxes.

Plaintiff asserts various constitutional violations as well as emotional and psychological injury due to the interactions she had with Defendants during the execution of the search warrant as well as alleged interactions with several Defendants occurring in the weeks following the search. CCPO SMF ¶ 64; Pl. Opp. CHPD SMF ¶¶ 147-161.

## III.    LEGAL STANDARD

### Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted)).

To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV.   DISCUSSION

### A.  Defendant Michael Higgins

To prevail on a negligence claim, Plaintiff must provide sufficient evidence to establish a (1) duty of care, (2) a breach of that duty, (3) proximate causation, and (4) actual damages. *Estate of Allen v. Cumberland Cnty.*, No. 15-6273, 2020 WL 3468180 at *10 (D.N.J. 2020). In other words, it must be proved that one party was negligent, and that negligence caused the other's injury. *Fedorczyk v. Caribbean Cruise Lines*, 82 F.3d 69, 73 (3d Cir. 1996).

First, "[w]hether a duty of care exists is a question of law that must be decided by the court. . . In making that determination, the court must first consider the foreseeability of harm to a potential plaintiff." *Borough of Edgewater v. Waterside Constr., LLC*, No. 14-5060, 2021 WL 3030280 at *6 (D.N.J. Jul. 19, 2021) (internal citations and quotations omitted). Foreseeability is a consideration relevant to both duty and proximate cause, but there are important differences when analyzing foreseeability under each element. Regarding a duty of care, foreseeability reflects the ability to perceive the risk. *Borough of Edgewater*, 2021 WL 3030280 at *6 ("The broad test of negligence is what a reasonably prudent person would foresee and would do in the light of this

foresight under the circumstances.") (internal citations and quotations omitted).  In New Jersey, additional factors are considered in the foreseeability analysis such as the relationship of the parties, the nature of the risk, the opportunity and ability to exercise care, and the public interest in the proposed solution to determine the fairness and appropriateness of the Court imposing a tort duty. *Giovanelli v. D. Simmons Gen. Contr.*, No. 09-1082, 2011 WL 2470591 at *2 (D.N.J. Jun. 17, 2011).

With regard to proximate cause, foreseeability focuses on whether the specific act or omission of the defendant as such that the ultimate injury to the plaintiff reasonably flowed from the breach of a defendant's duty. *Borough of Edgewater*, 2021 WL 3030280 at *6.  Causation in fact is considered a "most basic concept" within the element of proximate cause. *Estate of Allen*, 2020 WL 3468180 at *10.  Causation in fact depends on whether an act or omission "played a material part in bringing about an event." *Fedorczyk*, 82 F.3d at 73.  Negligence cannot be presumed. *Id.* at 74.  However, circumstantial evidence can be used to establish causation if based on sufficient probability by the preponderance of the evidence. *Id.* at 74-75.  Ultimately, Plaintiff has the burden of proof to establish causation. *Id.* at 74.

In a routine tort case, "the law requires proof that the result complained of probably would not have occurred 'but for' the negligent conduct of the defendant." *Brabory v. United States*, No. 16-3105, 2018 WL 2002789 at *6 (D.N.J. Apr. 30, 2018) (internal citations omitted).  A plaintiff must establish that the "natural and continuous sequence, unbroken by an efficient intervening cause, produce[d] the result complained of and without which the result would not have occurred." *Brabory*, 2018 WL 2002789 at *5.  An intervening cause that is reasonably foreseeable or are normal incidents of risk are not considered a break in the continuous sequence required to prove negligence. *Brabory*, 2018 WL 2002789 at *5.  Thus, a defendant's negligence does not need to

be the sole cause of the harm but must be a substantial contributing factor to the harm suffered by a plaintiff. *Brabory*, 2018 WL 2002789 at *6.

A defendant may not be found liable if there was a superseding intervening cause that entirely breaks the chain of causation such that the intervening cause alone caused the injury, without the initial negligence of the defendant contributing to it in any material way, and where the intervening cause was unanticipated. *Middlesex Water Co. v. 3M Co.*, No. 18-15366, 2022 WL 16552920 at *3 (D.N.J. Oct. 31, 2022). In other words, the superseding intervening cause must be unforeseeable: foreseeability, as it relates to the causation analysis, means "that which it is objectively reasonable to expect, not merely, what might conceivably occur." *Jakelsky v. Friehling*, 33 F. Supp. 2d 359, 365 (D.N.J. 1999) (internal citations omitted).

Proximate cause is an issue normally determined by the factfinder; however, a Court can grant summary judgment where the facts are such that no reasonable factfinder could find that the plaintiff has proven causation by the preponderance of the evidence. *Brabory*, 2018 WL 2002789 at *6. Additionally, the effect of an intervening cause is an issue traditionally left in the purview of the jury unless highly extraordinary events or conduct takes place. *Jakelsky*, 33 F. Supp. 2d at 366.

Defendant Higgins asserts three main arguments: that he did not have a duty of care to specifically mark the separate units beyond what was already apparent from the premises on February 28, 2020, that the execution of a "no-knock warrant" was not a foreseeable harm, and that the police action was a superseding intervening event that brought about Plaintiff's injuries. *See* Def. Higgins' Motion for S.J. at 10-13. Plaintiff asserts that Defendant Higgins had a duty to mark the separate units according to various state laws and local ordinances,[3] and the CCSO

---

[3] While Plaintiff provided several state laws and local ordinances, only those that plausibly suggest that Defendant Higgins had a duty to assign a specific marker to Plaintiff's unit will be discussed.

Defendants assert that they would not have entered the premises had they seen markings on the door or mailboxes that would suggest there were two separate units on the premises, among other arguments. *See* Pl.'s Response to Def. Higgins at 5-6; CCSO Def.'s Motion for S.J. at 12-13.

The most compelling regulations to support Plaintiff's assertion that Defendant Higgins had a duty to mark the dwelling are found in the New Jersey Administrative Code ("N.J.A.C."): § 5:10-18.1 which states in pertinent part: "[i]n multiple dwellings, there shall be identification by name and unit of dwelling space for each designated occupant, maintained by the person in charge of the premises or posted at or near the main entrance of the premises or in the lobby, lounge or mailroom area", and N.J.A.C. § 5:10-18.2 which states in pertinent part: "[e]very unit of dwelling space in hotels and multiple dwellings shall have some permanent and legible identification by letter, number or other symbol at or near the front entrance thereof [. . .]" N.J.A.C. § 5:10-18.1 – 18.2.

Defendant argues that these provisions are intended to solely cover hotels and apartment buildings simply because N.J.A.C. § 5:10-18.1 refers to a "lobby, lounge or mailroom area." The Court is not persuaded. A plain reading of the statute demonstrates that the required differentiation of the dwelling spaces are to be posted at or near the main entrance with alternative acceptable placements being in a lobby, lounge, or mailroom. It is clear from the face of the statute that the list of spaces are examples of alternative acceptable placements of the required information, not narrowing the applicability of the statute based on whether the structure has these spaces within. Further, the Court notes that if the legislators wanted to limit the applicability of the statute to a specific type of structure, such language would have been incorporated into the statute rather than the use of a broad description as provided by N.J.A.C. § 5:10-18.1 which simply utilizes the term "multiple dwellings." This is readily apparent by the language in N.J.A.C. § 5:10-18.2 which

applies to "hotels *and* multiple dwellings." (emphasis added). Thus, the Court finds that N.J.A.C. § 5:10-18.1 – 18.2 is applicable to a structure such as Defendant Higgins' building.

While Defendant Higgins' should have applied distinguishing markings to demonstrate the individual dwelling units, the Court must assess whether the risk related to Defendant Higgins' duty was foreseeable. As noted above, Defendant Higgins argues that the execution of a no-knock warrant is such an extremely rare occurrence that it could not be a foreseeable harm that a landlord would need to protect his tenants from, and that it would be wrong to attribute liability to him due to the failure of the police to ensure proper due diligence on the property prior to executing their warrant. Def. Higgins' Response to Def. CHPD Motion for S.J. at 2.

According to N.J.A.C. § 5:10-18.1, the responsibility of providing the required markings to a structure with multiple dwelling units falls to "the person in charge of the premises," and in this case Defendant Higgins does not dispute that he is the landlord of this premises. The attendant duties of the relationship between a landlord and a tenant are beyond cavil: in the context of a lease[4] a landlord has, at a minimum, a duty to keep areas within his or her control in a reasonably safe condition so as to not endanger the lives or property of his tenants. *Goldenbaum v. Delorenzo*, No. 08-1127, 2010 WL 2817198 at *2 (D.N.J. Jul. 16, 2010). The nature of the relationship between Defendant Higgins and Plaintiff inherently involves a duty of care. While the Court notes that Defendant Higgins was not put on notice from any authorities about the statutes, ignorance of the law is not an excuse for noncompliance, and he has owned the property for approximately a decade[5] and thus had ample opportunity and ability to provide some sort of labeling for the dwelling units of his property.

---

[4] The Court notes that Plaintiff sublet the apartment from the previous tenant, who had a written lease with Defendant Higgins, who testified in his deposition that Plaintiff "assumed the same terms as Madison." CHPD Motion for S.J., Ex. J at 67:3-22.
[5] Pl. Opp. CHPD SMF ¶¶ 134.

Further, the Court finds that the nature of the risk was foreseeable. While Defendant Higgins asserts that the execution of no-knock warrants are rare, and even rarer still that the police officers mistook his property for a single family home, "[f]oreseeability does not depend on whether the exact incident or occurrences were foreseeable. The question is whether the incident of that general nature was reasonably foreseeable." *McGovern v. City of Jersey City*, (D.N.J. Dec. 29, 2005). It is reasonably foreseeable that emergency services would or could respond to the property in some capacity, and where the lack of distinguishment between the units would be important such as a fire or medical emergency. It is fair and appropriate for a landlord to be held responsible for ensuring the safety of their tenants. Thus, the Court finds that there was a duty to mark the units separately pursuant to N.J.A.C. § 5:10-18.1 – 18.2, and this duty was breached by Defendant Higgins.

Next, the Court turns to the issue of proximate causation. Defendant Higgins argues that the execution of the no-knock warrant and the police officers' behavior during the execution of the warrant are superseding events that break the chain of causation. Def. Higgins' Motion for S.J. at 10. However, CCSO Defendants assert that had there been markings on the door and mailboxes the officers would not have breached the door and entered Plaintiff's apartment pursuant to the no-knock warrant. *See* CCSO Motion for S.J. at 12, Ex. F. at 46:2-22; Ex. G. at 23:7-8, 28:11-21; CCSO SMF ¶¶ 30-31, 38-40. Further, CCSO Defendants' expert also opined that breaching the second door was reasonable given the lack of markings on the door. CCSO SMF ¶ 42. While the CCSO Defendants' testimony is speculative, it creates an issue of fact and would require the Court to decide on the credibility of the CCSO Defendants, which is impermissible at this stage.

Summary judgment is inappropriate where "[r]easonable minds could differ as to the import of the evidence." *Middlesex Water Co. v. 3M Co.*, No. 18-15366, 2022 WL 16552920 at

*3 (D.N.J. Oct. 31, 2022). The Court finds that, given the assertions from the CCSO Defendants and their expert, while speculative, reasonable minds could differ as to whether the CCSO Defendants' actions "entirely supersede[d] the operation of [Defendant Higgins'] negligence that it alone caused the injury, without [Defendant Higgins'] negligence contributing thereto in *any* material way." *Middlesex Water Co. v. 3M Co.*, 2022 WL 16552920 at *3 (emphasis added). Therefore, the Court must deny Defendant Higgins' Motion for Summary Judgment.

### B. 5th, 8th, and 14th Amendment Violations

The Court notes that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims[.]" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal citations and quotations omitted). Given that the Plaintiff was not arrested nor was she incarcerated, her substantive due process claim relates to a search and seizure due to an inaccurate warrant, the alleged violation she suffered is more appropriately analyzed solely in the context of the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). Therefore, because Plaintiff does not have a separate cause of action that could be analyzed under any other amendment, summary judgment must granted in favor of Defendants regarding Plaintiff's 5th, 8th, and 14th Amendment claims.

### C. Municipal Liability: vicarious liability, *Monell* claims, Failure to Train

Municipal liability under 42 U.S.C. § 1983 ("§ 1983") requires that the municipality itself caused the underlying constitutional violation. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). It is not enough to identify conduct properly attributable to the municipality, a plaintiff must also demonstrate that the municipality was the "moving force" behind the injury alleged. *Awadalla v. City of Newark*, No. 16-02530, 2023 WL 6633851 at *2 (D.N.J. Oct. 12, 2023). In

13

other words, liability pursuant to *respondeat superior* or vicarious liability cannot apply to a municipality in the context of a §1983 claim. *See Houston v. Twp. of Randolph*, 934 F. Supp. 2d 711, 725 (D.N.J. 2013). Further, the New Jersey Civil Rights Act ("NJCRA") does not impose vicarious or *respondeat superior* liability, in accordance with its analogous treatment of claims pursuant to § 1983. *See Meleika v. Bayonne Police Dep't*, No. 17-1958, 2020 U.S. Dist. LEXIS 80897 at *19, 19 n.11 (D.N.J. May 7, 2020). Thus, the Court must grant summary judgment on Plaintiff's claims of vicarious liability against the CCSO and CHPD.

Turning to Plaintiff's *Monell* claim, a municipalities' failure to train its police officers may subject it to liability, but "only where it reflects a deliberate or conscious choice by the municipality." *Altidor v. Toms River Police Dep't*, No. 18-14834, 2022 WL 17155698 at *14 (D.N.J. Nov. 22, 2022) (internal citations and quotations omitted). Deliberate or conscious choice can be shown by identifying a policymaker that had notice that a course of training was deficient, typically by a pattern of constitutional violations, to infer that the policymaker had deliberately chosen a training program that would cause a violation of constitutional rights. *Id.* The Third Circuit has noted that a failure to train claim cannot be established by simply presenting evidence of the shortcomings of an individual officer, proving that an otherwise sound training program occasionally was negligently administered, or showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct. *Id.* A plaintiff must identify specific training or policies that would prevent the harm suffered and show that there was a failure to provide such training that can "reasonably be attributed to deliberate indifference." *Id.* (quoting *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005)). A pattern of similar constitutional violations by untrained employees is typically necessary to establish deliberate

indifference for purposes of maintaining a failure to train claim. *Stankevicius v. Town of Harrison*, No. 18-9649, 2022 WL 3273872 at *9 (D.N.J. Aug. 10, 2022).

First, Plaintiff concedes that there are not enough facts to sustain a *Monell* claim against the CHPD, and therefore the Court will grant summary judgment on this claim. Plaintiff further argues that there should have been "checklists" related to the development and execution of search warrants, however she does not point to any specific training or policy that would prevent the harm she suffered, nor does Plaintiff identify a specific policymaker(s) to demonstrate the requisite deliberate indifference to survive a motion for summary judgment. With regard to the CCSO Defendants, the record falls short of establishing deliberate indifference to providing training on the execution of search warrants. CCSO Defendants testified to receiving extensive training multiple times per week including the execution of residential search warrants, including classes and hands-on, live scenarios. *See* CCSO SMF ¶¶ 11-16.

Therefore, Plaintiff's failure to train claims asserted against the CCSO fail as a matter of law and thus the Court grants the CCSO Defendants' motion for summary judgment as to Plaintiff's failure to train claim.

Turning to the failure to train claim raised against the CCPO, the Third Circuit has held that procedures, policies, and training regarding seizures require the type of legal knowledge and discretion that are related to a prosecutorial office's function and are thus protected by absolute immunity. *Hyatt v. County of Passaic*, 340 Fed. Appx. 833, 837-38 (3d Cir. 2009). Therefore, Plaintiff cannot bring a claim against the CCPO. To this end, Plaintiff cannot circumvent absolute immunity by alleging additional *Monell* liability under § 1983 because, under New Jersey law, when county prosecutors and their subordinates perform law enforcement and prosecutorial functions, they are acting as agents of the State. *Id.* at 836. Therefore, a county prosecutor's office

15

can only be held liable under § 1983 in situations where prosecutors are performing administrative tasks unrelated to their prosecutorial functions, of which "[t]raining and policy decisions that require legal knowledge and discretion are . . . unlike administrative tasks." *Id.*

Therefore, Plaintiff's failure to train claims asserted against the CCPO fail as a matter of law.

### D. 42 U.S.C. § 1983 Claims[6] Against Organizational Defendants CCSO, CCPO, and CHPD

42 U.S.C. § 1983 imposes liability on "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To prevail on a claim under §1983 a plaintiff must show that, "some person has deprived him of a federal right . . . [and] that person who has deprived him of that right acted under the color of state or territorial law." *Halsey v. Pfeiffer*, 750 F.3d 273, 290 (3d Cir. 2014). "Generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Willson v. Yerke*, 604 Fed. App'x 149, 150 n.4 (3d Cir. 2015)). However, a "person" under § 1983 is defined by law as local governmental bodies and their officials, however the Supreme Court in *Will v. Michigan Department of State Police*, held that "neither a State [itself] nor its officials acting in their official capacities are 'persons' under § 1983." *Id.* at 491 U.S. 58, 71 (1989).

---

[6] To the extent that Plaintiff asserts NJCRA claims, the NJCRA was modeled after 42 U.S.C. § 1983 (creating a private cause of action for violations of civil rights under the New Jersey Constitution). *See Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011). Courts in this District have "repeatedly construed the NJCRA in terms nearly identical to its federal counterpart," and therefore Plaintiff's NJCRA claims are sufficiently addressed through the lens of this Court's analysis of Plaintiff's § 1983 claims. *See Estate of Martin v. U.S. Marshals Serv. Agents*, 649 F. App'x 239, 245 n.4 (3d Cir. 2016) ("The Third Circuit has held that claims under the New Jersey Constitution and the NJCRA 'trigger the same legal elements and principles as . . . [the] federal causes of action [under Section 1983].'").

The Third Circuit has held that a prosecutor's office, when acting "within its classical function of investigating criminal activities and conducting criminal prosecutions" is considered an "arm of the State" and thus cannot be held liable under § 1983. *Estate of Lagano v. Bergen County Prosecutor's Office*, 769 F.3d 850, 855 (3d Cir. 2014).

Further, the Third Circuit has held that "[i]n Section 1983 actions, police departments cannot be sued in conjunction with municipalities, because the police department is merely an administrative arm of the local municipality, and is not a separate judicial entity." *Padilla v. Twp. of Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004); *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 430 (D.N.J. 2011) (granting summary judgment in favor of police department on same basis).

First, Plaintiff concedes their failure to train claim against the CHPD, and therefore the Court will grant summary judgment. With regard to the CCSO and the CCPO, these entities are not "persons" pursuant to § 1983, and similarly the Court will grant summary judgment.

Contrary to the arguments of the CCSO, a county sheriff's office is not necessarily analogous to a municipal police department regarding its capacity to be sued because under New Jersey Law the office of the sheriff is a constitutionally created office, whereas a municipal police department is created by local municipal ordinance. *See Rhine v. Camden County Sheriff's Office*, No. 9-6093, 2012 WL 3776026 at *9 n.7 (D.N.J. Aug. 29, 2012) (noting that N.J.S.A. § 40A:14-118 establishing municipal police departments as an arm of a municipality and the New Jersey Constitution, Article II, § 2 establishing that the county sheriff shall be elected by the people of a county in general election for a term of three years). However, whether the CCSO is a creature of the constitution or of the county (akin to the municipality), the result would ultimately lead to the same conclusion: that the CCSO is not considered a "person" pursuant to § 1983. If the Court

were to decide that the constitutional basis of the Sheriff divorced the CCSO from the county, it would simply be considered an arm of the State pursuant to the same analysis that applies to county prosecutor's offices, which is similarly created by the state Constitution and governed by an elected official. *See Coleman v. Kaye*, 87 F.3d 1491, 1500-01 (3d Cir. 1996). If the Court were to decide that, because of its role and function in relation to police departments, the CCSO was a sub-division of the county and not a separate legal entity, the CCSO would not be a "person" pursuant to § 1983. *See Rhine*, 2012 WL 3776026 at *10 (citing *McLaughlin v. County of Gloucester*, No. 6-4494, 2008 WL 700125 at *2 (D.N.J. Mar. 12, 2008)). Thus, the Court finds that the CCSO is not considered a "person" pursuant to § 1983 and therefore summary judgment must be granted for the CCSO as an entity.

The CCPO is "an arm of the State" and not a separate judicial entity when it investigates, arrests, and prosecutes an individual. *Castro v. New Jersey*, 521 F. Supp. 3d 509, 525 n.17 (D.N.J. 2021). Plaintiff does not allege that the CCPO performed any actions against her that were not related to the CCPO investigating the target of a criminal investigation. Thus, summary judgment must be granted relating to Plaintiff's § 1983 claims against the CCPO as an entity.

### E.  42 U.S.C. § 1983 Claims Against Individual Defendants

Plaintiff asserts several § 1983 claims against the individual Defendants: judicial deception against CHPD Defendant Harmon and CCPO Defendant Miller, unlawful search and seizure, excessive force, and failure to intervene against all individual Defendants. The Court will analyze each of claim in turn.

#### i.  Judicial Deception

"The purpose of a judicial deception claim under § 1983 is to challenge[] the validity of a search warrant by asserting that law enforcement agents submitted a false affidavit to the issuing

judicial officer[.]" *Williams v. Healy*, No. 8-2389, 2012 WL 2594348 at *9 (D.N.J. 2012) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)) (internal quotations omitted).  To maintain a claim of judicial deception, a plaintiff must prove by the preponderance of the evidence that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant and that such statements or omissions are material to the finding of probable cause.  *Id.*  Falsehoods are material when an affirmative false statement is excised from the warrant or where the omission is included in the search warrant, and the warrant with these alterations is insufficient to establish probable cause on the preponderance of the evidence. *Sherwood*, 113 F.3d at 399-400.

Here, the Parties disagree on whether the affiant, CCPO Defendant Miller,[7] knowingly or recklessly made the false statements and omissions, and so the Court will focus on whether any of the false statements or omissions were material to the finding of probable cause.  Plaintiff asserts that the knowingly false claim CCPO Defendant Miller made was "the property information had been obtained from the New Jersey Department of Taxation records" when he instead used "a public non-verifiable website known as NJ Parcels." Pl. Opp. CCSO SMF ¶¶ 54, 56.[8]

If the search warrant reflected that the information CCPO Defendant Miller provided regarding the 308 Walnut Avenue pursuant to a non-governmental website (eliminating the falsehood that the basis of the affidavit's information about the property came from New Jersey Tax Department documents), such a change could have possibly given the signing Judge pause to

---

[7] As discussed *infra*, CHPD Defendant Harmon did not contribute any falsehoods or omissions to the search warrant and Plaintiff does not point the Court to any case law to demonstrate that CHPD Defendant Harmon, an officer working for a different entity, had a "duty to check" CCPO Defendant Miller's work.  Thus, the Court will not belabor the point and grants summary judgment for CHPD Defendant Harmon on the claim of judicial deception.

[8] The Court notes that Plaintiff asserts that both CCPO Defendant Miller and CHPD Defendant Harmon "averred in the application for the search warrant that 308 Walnut was a single family residence.  This was also not true; 308 Walnut was a duplex[.]" but the Court recognizes that this is not presented as a <u>knowingly false statement</u>.  The information was simply incorrect. Pl. Opp. CCSO SMF ¶ 55.

question the affiant about their confidence in the information provided, but that is not sufficient to prove a judicial deception claim. The standard is whether such a change would have impacted the probable cause analysis.

In other words, in the context of a judicial deception claim, this Court must determine whether a genuine issue of material fact exists as to whether the corrected affidavit establishes probable cause. *Sherwood*, 113 F.3d at 401. Probable cause exists to support the issuance of a search warrant if, based on a totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Sherwood*, 113 F.3d at 401.

In accordance with the dictates of *Sherwood*, the reconstructed part of the affidavit would read as follows: "AN APPLICATION OF THE STATE OF NEW JERSEY FOR A SEARCH WARRANT TO SEARCH THE PROPERTY KNOWN AS 308 WALNUT AVENUE, GLOUCESTER CITY, NEW JERSEY 080430. THE PROPERTY IS MORE SPECIFCIALLY DESCRIBED BY ~~THE NEW JERSEY DEPARTMENT OF TAXATION~~ "NJ PARCELS.COM" AS BLOCK 271, LOT 5. THE RESIDENCE IS A SINGLE-FAMILY HOME WITH OFF-WHITE COLORED SIGDING AND A GRAY ROOF. THERE ARE THREE WINDOWS TO THE RIGHT AND THREE WINDOWS TO THE LEFT OF THE FRONT DOOR AND ALL HAVE BLUE TRIM. THERE IS A DETEACHED GARAGE TO THE REAR AND TO THE LEFT OF THE RESIDENCE, WHICH IS SIMILAR IN COLOR AS THE RESIDENCE AND HAS BLUE TRIM. THE RESIDENCE HAS A WHITE SCREEN DOOR WITH ANOTHER WHITE DOOR BEHIND IT. THE WHITE SCREEN DOOR OPENS OUTWARD FROM RIGHT TO LEFT. THE NUMBER 308 IS WHITE IN COLOR AND IS AFFIXED TO THE RESIDENCE TO THE BLACK MAILBOX TO THE RIGHT OF THE DOOR." There would be

no other changes in the 11 pages and 33 paragraphs that support the affidavit. *See* Pl.'s Opp. to CHPD Motion for S.J., Ex. 1.

The Court notes that the description of the home as well as the block and lot number were correct. Further, the information provided by Plaintiff's counsel purporting to show the information for 308 Walnut Avenue from the NJ Parcels website does not explicitly list the home as a single family residence. *See* Pl.'s Opp. to CCSO Motion for S.J., Ex. 10. The website simply lists the property as "308 Walnut Ave." *Id.* Additionally, the website also states that the information displayed is from "public records," with the warning that NJ Parcels.com makes "no guarantees on the validity of the data presented. Information should be independently confirmed and you use the information displayed here at your own risk." *Id.* To this point, the record shows that there was some additional, credible information that suggested the property was a single family home, such as the suspect's license reading "308 Walnut Avenue" with no unit specified from the New Jersey Motor Vehicle Commission and the same address appearing in a police database, again with no unit specified. *See* Pl's Opp. to CCSO Motion for S.J. Ex. 1, ¶¶ 15-16. Thus, while relying on NJ Parcels.com was a mistake in hindsight, the Court acknowledges that at the time of the creation of the warrant there was corroborating information regarding 308 Walnut Avenue as a single property.

In this case, there was sufficient probable cause from the controlled buy from the property and reliable informant information obtained by CHPD Defendant Harmon that the target was dealing marijuana, (which at the time was illegal), from the property of 308 Walnut Avenue for the investigators to obtain a search warrant on those grounds. *See* CHPD SMF ¶¶ 7; CCPO SMF ¶¶ 16; CHPD Motion for S.J. at 6. Several officers observed the home and did not suspect the

home was a duplex.  CHPD SMF ¶¶ 32, 45, 55; CCPO SMF ¶¶ 17-19.  The physical description of the premises was correct.  CCPO SMF ¶ 2.

The only change to the warrant would have been to acknowledge that the information about the home came from a non-governmental website that was recommended to the affiant by his supervisor.  CCPO SMF ¶¶20-21.  This would not change the fact that there was ample support to demonstrate that there was a fair probability that contraband and evidence of drug dealing would be found at 308 Walnut Avenue.[9]

Ultimately, judicial deception simply requires the Court to remove the false information as identified by Plaintiff and replace it with the correct information, which was not "308 Walnut Avenue is a duplex."  Further, the pieces of information Plaintiff points to on the NJ Parcels website that she believes "proves" that there was a second unit on the property were not conclusive of a multi-unit property,[10] and for the fact that 308 Walnut Avenue was a duplex to become known and thus incorporated into the warrant would have required CCPO Defendant Miller to think more critically about the context clues embedded in the information about the property he potentially received from the NJ Parcels.com website and to think more critically about the website itself, to

---

[9] CCPO Defendant Harmon noted that he assumed that the information from NJ Parcels.com was from a government taxation website and the website itself displays that the information is obtained by public records. *See* Pl.'s Opp. to CCSO Motion for S.J., Ex. 2 at 57:2-4; Ex. 10.  Thus, if the Court did engage in the theoretical inquiry posed by Plaintiff, and the judge did inquire CCPO Defendant Miller as to his confidence regarding the information from the website, the response from CCPO Defendant Miller ostensibly would have been "it [is] my understanding [the website's information] was from the government tax website," and that the website was "previously used and recommended" by a detective to him, as he testified to in his deposition. See Pl.'s Opp. to CCSO Motion for S.J., Ex. 2 at 21:17-24; 26:2-10; 56:22-25 -- 57:1.  Thus, even in this alternative scenario, the probable cause analysis is not materially impacted.

[10] A screen shot of what is purported to be NJ Parcels.com shows on page 2 that there are three entries regarding utilities, and on page three there is one listed registered voter listed as Plaintiff. *See* Pl.'s Opp. to CHPD Motion for S.J. Ex. 10.  The Court believes that this information was accessed by Plaintiff's counsel from the NJ Parcels' website around February 3, 2023 pursuant to his statements made in the Deposition of Joseph Miller, which took place on even date.  *See id.* at Ex. 2, page 33:1-25.  Thus, this information may not have been the same information CCPO Defendant Miller would have seen when researching the property for the search warrant, but given the summary judgment standard providing all plausible inferences supportable by the record to Plaintiff, the Court will accept the information as if it were present on the website when CCPO Defendant Miller accessed it.

have acted differently upon that information, and subsequently researched or further investigated, then discover that there are two units at 308 Walnut Avenue, and then finally change the affidavit of probable cause to show that the property was a duplex. This analysis is several steps beyond what the elements of judicial deception requires a Court to contemplate. Thus, the Court must enter summary judgment for CCPO Defendant Miller.

### ii.   Unlawful Search

Plaintiff argues that she was subject to an unlawful search: that because the search warrant contained false information, Defendants did not have probable cause to enter her apartment. The Fourth Amendment requires all warrants to describe with particularity the place to be searched and the persons or things to be seized in order to prevent general searches. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). A warrant meets the particularity requirement if the description is sufficient for an officer to ascertain and identify the place intended with reasonable effort. *Reid v. Schuster*, No. 5-3838, 2008 U.S. Dist. LEXIS 22113 at *24 (D.N.J. Mar. 18, 2008) (internal citations and quotations omitted). Thus, "[t]echnical errors in the warrant and affidavit, including erroneous addresses, will therefore not necessarily invalidate a warrant and subsequent search." *Id.* at *24-25. When officers obtain and execute a search warrant with a good faith belief that the warrant is valid, they have not violated the Fourth Amendment if, in hindsight, the warrant is invalidated. *See United States v. Leon*, 468 U.S. 897, 923-24 (1984). This good faith protection is limited and can be set aside in cases where if the judge issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth, where a judge wholly abandoned his judicial role, if an affidavit is so lacking in probable cause as to render official belief in its existence entirely unreasonable, or the

warrant is deficient on its face in failing to particularize the place to be searched or things to be seized that an executing officer could not reasonably presume its validity. *Id.* at 923.

Plaintiff argues that the Defendants in this case do not benefit from good faith protection because the judge issuing the warrant was misled by information in the warrant application provided by CCPO Defendant Miller and CHPD Defendant Harmon.[11] Plaintiff asserts CCPO Defendant Miller falsely inserted that the information about 308 Walnut Avenue came from the New Jersey Department of Taxation records, when in reality the information about the property came from a non-government website called NJ Parcels, and that CCPO Defendant Miller and CHPD Defendant Harmon both averred that 308 Walnut Avenue was a single family residence. Pl's Opp. to CCPO SMF ¶¶ 67-69. The record, however, does not support this characterization of the events that led to the search warrant being signed by the judge.

As to CHPD Defendant Harmon, the only false statement Plaintiff attributes to him is that he "averred in the application for the search warrant that 308 Walnut was a single family residence." Pl's Opp. to CCPO SMF ¶ 69. Plaintiff does not state that CHPD Defendant Harmon knew this statement to be false, nor does she state that he drafted this statement, in contrast to her allegations against CCPO Defendant Miller. *Id.* ¶¶ 67-68. The Court notes this distinction because there are no material facts to suggest CHPD Defendant Harmon made any false statements in his contribution to the warrant. CHPD Defendant Harmon provided the information he obtained from his informant about drug dealing activity from the property and organized the investigative drug buys from the target. CHPD SMF ¶¶ 7-9, 42, 44, 54. Plaintiff does not assert that any of this information that was incorporated into the search warrant was false. CHPD Defendant Harmon's

---

[11] There is no evidence in the record to suggest that CCSO Defendants were involved at any point in the creation of the affidavit or involved in the hearing before the judge with regards to the search warrant's issuance, and therefore the Court will focus its analysis on CCPO Defendant Miller and CHPD Defendant Harmon.

surveillance during his investigation did not indicate that the entire property was not under the control of the target: the warrant reflects an incident where the target exited from the side door of the home when he was engaging in a drug buy located in a parking lot close to the property, further providing credence to the idea that the target occupied the full home. Pl's Opp. to CCSO Motion for S.J. Ex. 1, ¶ 27; CHPD SMF ¶ 45. Further, CHPD Defendant Harmon did not have any reason to believe that CCPO Defendant Miller provided any false information, nor did he have the obligation or instruction to check CCPO Defendant Miller's work. CHPD SMF ¶¶ 7-10, 42-44.

Given the facts related to CHPD Defendant Harmon's contributions, the record does not support, nor the Court can find, that he knowingly incorporated false statements. The complained of conduct is entirely within the ambit of CCPO Defendant Miller. Plaintiff points to the fact that CCPO Defendant Miller asserted the information used in the search warrant came from the New Jersey Department of Taxation, but instead used "NJ Parcels.com," which only CCPO Defendant Miller utilized. CHPD SMF ¶ 44; CCPO SMF ¶¶ 20-21. This website possibly indicated more than one internet provider listed for the property, that the property was likely a rental property (by showing that the property was owned by Defendant Higgins and not the target), and shown Plaintiff as a registered voter at the premises.[12] Plaintiff further argued that while CCPO Defendant Miller was involved in investigating the target, he also should have noticed the structural elements of the home that would suggest the property was a duplex: that there were two doors of different design, two mailboxes, and two utility meters. Plaintiff argues that this constellation of information was sufficient to demonstrate that the property was a duplex, or that he should have provided this

---

[12] The Court notes that this information was gathered by Plaintiff's counsel and was revealed in CCPO Defendant Miller's deposition. *See* Pl.'s Opp. to CHPD Motion for S.J. Ex. 10; Ex. 2, page 33:1-25. It is not clear from the record if this information was actually present on the website the day that CCPO Defendant Miller utilized it for his research into 308 Walnut Avenue. However, the Court analyzes this information here as if it had been for the purpose of summary judgment.

information in the warrant affidavit, or possibly he should have caused him to conduct further research to clarify if the 308 Walnut Avenue was in fact a single family home.

However, the record reflects that there was other information known by CCPO Defendant Miller that suggested the home was a single family home. The suspect's license reflected the address of "308 Walnut Avenue" with no unit specified from the New Jersey Motor Vehicle Commission, and the police database reflected the same. *See* Pl's Opp. to CCSO Motion for S.J. Ex. 1, ¶¶ 15-16. The NJ Parcels website did not specify it was a single family home but did reflect the address as simply "308 Walnut Avenue." See Pl.'s Opp. to CHPD Motion for S.J. Ex. 10. With regard to the physical structure of the property, in Plaintiff's deposition, she acknowledges that one would not be able to see the second mailbox from the front of the home, making it less plausible that Defendant Miller would have been able to see this detail during his surveillance of the property. CHPD SMF ¶ 84.

The Court notes that it is important to review the information from the perspective of a reasonable officer at the time, and not with the benefit of 20/20 hindsight, even when providing all inferences to the nonmovant. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Given the circumstances, the Court does not find any of these pieces of information, even if true and considered collectively, to be strong enough to support an assertion that CCPO Defendant Miller *knew* 308 Walnut Avenue was a duplex or would have known this was false except for a reckless disregard for the truth.

Further, the assertion that CCPO Defendant Miller knowingly made the false statement that the information about 308 Walnut Avenue came from the New Jersey Department of Taxation records is not as clear cut as Plaintiff argues it to be. CCPO Defendant Harmon noted that he assumed that the information from NJ Parcels.com was from government taxation documents and

the website itself displays that the information is sourced by public records. *See* Pl.'s Opp. to CCSO Motion for S.J., Ex. 2 at 21:17-24; 26:2-10; 56:22-25 – 57:1-4; Ex. 10. However, even if the Court were to fully afford this inference of knowledge as to the falsity of this statement to Plaintiff, the Court would undertake the same analysis provided for judicial deception and come to the same conclusion. Thus, the Court cannot find that the judge issuing the warrant was misled because the affiant did not know the information was false nor would have known it was false except for his reckless disregard for the truth. At best, CCPO Defendant Miller was negligent, maybe grossly so, but that is not sufficient to overcome the good faith exception.

Moreover, an error in the affidavit or warrant does not immediately invalidate the warrant and its subsequent search. "Technical errors in the warrant and affidavit, including erroneous addresses, will therefore not necessarily invalidate a warrant and subsequent search." *Reid v. Schuster*, No. 5-3838, 2008 U.S. Dist. LEXIS 22113 at *24-25 (D.N.J. Mar. 18, 2008) (internal citation omitted). "The Fourth Amendment is not violated . . . by the mistaken execution of a valid search warrant on the wrong premises." *Graham*, 490 U.S. 396 (citing *Maryland v. Garrison*, 480 U.S. 79 (1987)). As in *Maryland v. Garrison*, in this case, too "there is no claim that the persons or things to be seized were inadequately described or that there was no probable cause to believe that those things might be found in the place to be searched as it was described in the warrant." *Garrison*, 480 U.S. at 85. Facially, the warrant in the instant case provided sufficient probable cause and detail to show the CCSO Defendants the "where" and the "what" to be searched and seized: the location and description of the property were accurate, the affidavit cited to an undercover drug buy from the location, as well as the details from the investigation into the target, and specified the drug paraphernalia to be seized. Pl's Opp. to CCSO Motion for S.J., Ex. 1 at 1,

¶ 30. All of these details demonstrate that the warrant as facially valid from the perspective of the CCSO Defendants.

The validity of the warrant must be assessed on the basis of information that the officers disclosed, or had a duty to discover and to disclose, to the issuing judge. In *Maryland v. Garrison*, the officers thought the third floor had one apartment, and after the execution of the warrant, discovered there was a separate dwelling unit which would have been excluded had that fact been known. *Id*. at 86-87. An informant provided the address, which was a three story apartment building. *Id*. at 85 n.10. The officer inquired at the local gas and electric company to determine the name listed for the third story apartment, and the company said there was only one listed person for the third floor. *Id*. Police department records matched the address to the person listed as the third floor occupant from the gas and electric company. *Id*. When executing the warrant, the officers searched the entire floor, as they "perceived [the target's] apartment and the third floor premises as one and the same; therefore their execution of the warrant reasonably included the entire third floor." *Id*. at 88.

The validity of the search of Plaintiff's apartment pursuant to a warrant authorizing the search of the entire premises depends on whether the officer's failure to realize the overbreadth of the warrant was objectively understandable and reasonable. "Sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment[.]" *Id*. at 87. Here, the Court reiterates that Defendants checked more than two sources, including a police database, to determine the status of the 308 Walnut Avenue property. The failure to discover the fact that the property was a duplex was a mistake, but "[b]ecause many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading

sensibly to their conclusions of probability." *Id*. at 87 n.11. The Court finds that the mistake made by Defendants in their entry and search of Plaintiff's unit on February 28, 2020, was a reasonable mistake. Therefore, the warrant was valid, and the search lawful.

But even if the Court considered the warrant invalid, on the day of the warrant's execution, the CCSO Defendants operated in good faith when they inquired about breaching the second door they discovered on the side of the property and proceeded with the search into Plaintiff's unit when the affiant indicated that the search warrant gave permission to search the entire property. CCSO SMF ¶¶ 26, 27. Further, where a judge has issued a warrant, as here, the supporting affidavit is entitled to a presumption of validity. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The Court finds that the analysis looks much the same for CHPD Defendants: CHPD Defendant Harmon had input into the search warrant, however, he provided solely the accurate information from the controlled buys he conducted as part of his investigation. CHPD SMF ¶¶ 7-10. CHPD Defendants on the day of the warrant's execution followed the same steps as the CCSO Defendants and did not contribute to the decision to enter the second floor. CHPD SMF ¶ 104; CCSO SMF ¶ 27.

While Plaintiff argues that the Defendants should have recognized the property as a duplex from their limited surveillance and from various visual cues once the CCSO Defendants were in the throes of the warrant execution that 308 Walnut Avenue was a duplex. However, the various elements Plaintiff points to as "proof" that the premises was a duplex (the presence of the two utility meters (which the parties debate as to their visibility), different doors in different styles, the presence of two mailboxes, and the absence of an internal staircase), the Court does not find these elements strong enough to support an assertion of knowledge on behalf of the Defendants, especially in the context of executing a no-knock search warrant in the early hours of the morning.

The Court finds that it was objectively reasonable that once Defendants were told they had permission to search the entire property that they would enter the second floor.  CCSO SMF ¶¶ 26, 27; CHPD SMF ¶¶ 25, 28 34.  The CCSO Defendants believed in good faith that the search warrant gave them the legal permission to enter the second floor of the premises, and once inside they followed their standard protocols to secure the building for the investigating agencies to conduct their search.  CCSO SMF ¶¶ 30, 43-47.[13]

### iii.  Unreasonable Seizure and Excessive Force

The Fourth Amendment requires the Court to use an objective reasonableness standard when evaluating whether a police officer allegedly used excessive force during an arrest. *Whichard v. Willingboro Twp.*, (D.N.J. Aug. 26, 2015).  To establish a claim for excessive force as unreasonable seizure, a plaintiff must show that a seizure occurred and that the seizure was unreasonable.  The Parties do not contest that Plaintiff was seized during the search of her home, and it is axiomatic that the right to be free from physical force when not resisting arrest was a clearly established right at the time of February 28, 2020.[14]  Thus, the only issue before the Court is whether Plaintiff has alleged sufficient facts to support a reasonable jury finding that when the officers effectuated the arrest, they used excessive force in violation of the Fourth Amendment. *Stabile v. Conklin*, No. 20-02205, 2023 U.S. Dist. LEXIS 147040 at *6-7 (D.N.J. Aug. 22, 2023) (citing *Pearson v. Callahan*, 555 U.S. 223, 243 (2009)).  At the summary judgment stage, once the Court has determined the relevant set of facts and drawn all inferences in favor of the

---

[13] Given the foregoing, the Court declines to address the protective sweep doctrine.

[14] In certain cases, handcuffs that are "excessively tight" have been found sufficient to constitute excessive force. *Lane v. Schade*, No. 15-1568, 2018 WL 4571672 at *5 (D.N.J. Sept. 23, 2018).  Given the fact that zip ties serve as a functional equivalent to restrain individuals and because the Court has not found any cases to suggest a different standard applies to zip ties, the Court will interpret Plaintiff's excessive force claims in light of the case law applicable to handcuffs.

nonmovant to the extent supportable by the record, the reasonableness of an officer's actions is purely a question of law. *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

The factors the Court must consider to determine the reasonableness of the use of force include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting[,]" as well as the duration of the action, the possibility that the suspect may be armed, and the number of persons that the police officers had to contend with at the time. *Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (2021); *see also Kopec v. Tate*, 361 F.3d. 772, 777 (3d Cir. 2004). The Court must also be careful to assess the use of force from a reasonable officer's perspective on the scene, which are often "tense, uncertain, and rapidly evolving," and avoid the application of the facts known only from the viewpoint of hindsight. *Stabile*, 2023 U.S. Dist. LEXIS 147040 at *7.

Here, the Court will address each of these factors in turn. There is no dispute of material fact as to reasonableness. Plaintiff was discovered in bed, cooperative with officers, and was placed into zip ties after she was permitted to dress while CCSO Defendants secured the unit and the CCPO and CHPD searched for the target of the warrant. CCPO SMF ¶¶ 34-36; CCSO SMF ¶¶ 43-44. Plaintiff asserts that the zip ties were tight but does not report any physical injuries related to the zip ties. Pl. Opp. CCSO SMF ¶ 85. There is disagreement as to precisely how long Plaintiff remained in the zip ties and whether Plaintiff had to ask for the zip ties to be removed, but all Parties agree that the zip ties were removed at the end of the encounter. *Compare* CCSO SMF ¶¶ 43, 44, 46, 49 *and* Pl. Opp. CCSO SMF ¶¶ 86-87. In terms of the overall context, Defendants were executing a no-knock search warrant which are only granted sparingly in cases

31

where there is inherent danger, and Defendants were anticipating both the target, his mother, and a vicious dog to be on the premises. CHPD SMF ¶¶ 34, 36, 39, 40; CCSO SMF ¶¶ 7, 17, 21-22. After searching the first floor of the premises and not finding the target, Defendants were "anxious" to locate the target and neutralize any threats. CCSO SMF ¶ 21; CHPD SMF ¶¶ 25, 28.

Given the particular facts and circumstances of this case, the Court finds that the force used against Plaintiff, while unwelcome and understandably alarming, was objectively reasonable from the perspective of a reasonable officer on the scene. The officers executing the no-knock search warrant were expecting more than one individual in the home, as well as a vicious dog, and the target who was suspected of distributing drugs. CCSO SMF ¶¶ 7, 17, 21-22. Officers were concerned that the target could pose a threat to others. CHPD SMF ¶ 34. Even without the heightened perception of danger indicated by the no-knock warrant, a brief detention can be deemed reasonable under the circumstances where it is just long enough for the police to ensure their safety and collect the evidence sought, and simply "protecting the safety of the [officers] alone can justify a reasonable detention of an individual during the execution of a search warrant." *United States v. Fautz*, 812 F. Supp. 2d 570, 614 (D.N.J. 2011) (quoting *United States v. Allen*, 618 F.3d 404, 408-10 (3d Cir. 2010) (discussing *L.A. County v. Rettele*, 550 U.S. 609 (2007)). The Court finds that such a permissible, brief detention for the safety of officers and the collection of evidence occurred here.

Furthermore, the application of zip ties did not make Plaintiff's brief detention unreasonable, nor was the application of the zip ties use of excessive force. When officers entered Plaintiff's apartment, Plaintiff was cooperative, and due to her state of undress, the officers permitted her to put on a sweater before applying the zip ties. CCPO SMF ¶¶ 34-36; CCSO SMF ¶ 21. Plaintiff did not communicate any discomfort due to the zip ties to the officers, nor is there

any evidence or allegations that Plaintiff was injured by the application or duration of wearing the zip ties. Pl. Opp. CCSO SMF ¶ 85. Defendant Kolins, Chief John Fetzer of the Camden County SERT team, and CCSO Defendants' expert testified that placing Plaintiff in zip ties while the search of the premises was ongoing is in line with the standard protocols of executing a no-knock search warrant. *See* CCSO SMF ¶ 45; CHPD SMF ¶¶ 40, 50.

When evaluating excessive force claims involving restraints, attention must be paid to the duration of a plaintiff's restraint; whether a plaintiff portray any "signs of discomfort" that demonstrate "obvious visible indicators" of pain, such as cuts, bruises, or swelling, loss of hand mobility, nerve damage, or blood restriction; if plaintiff sought medical attention; or if plaintiff communicated experiencing pain to officers during the interaction. *See Lane*, 2018 WL 4571672 at *5 (quoting *Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005).

Here, while it is uncertain how long Plaintiff was restrained in zip ties, the Court notes that the longest recounting of the events at 308 Walnut Avenue was 30-45 minutes to one hour, when the search of the premises ended. Pl. Opp. CCSO SMF ¶¶ 86-87. Thus, the Court will presume for the sake of summary judgment that Plaintiff was restrained for the duration of that time.[15] Plaintiff did not communicate to officers about the zip ties causing pain, but proports she had to "chase" officers after leaving her apartment to release them. Pl's Opp. CCSO SMF ¶ 44. Plaintiff does not point to any facts to demonstrate any indicators of pain or injury, nor did she allege she sought medical treatment for her wrists. Other courts have found against other plaintiffs in conditions far worse than presented here. For example, in *Gilles v. Davis*, the Third Circuit found that, although plaintiff was kept in handcuffs for approximately three to four hours and

---

[15] The Court notes that Plaintiff asserts in her response to CHPD SMF that the plastic twist ties were on her wrists for approximately 15 minutes, but for the fact that the record has many varied estimates of how long Plaintiff was restrained, the Court assesses the duration for the longest recounting present in the record in accordance with the summary judgment standard. Pl's Opp. CHPD SMF ¶ 50.

33

communicated to officers that he was experiencing pain, because he did not portray any "signs of discomfort" nor seek medical treatment after, summary judgment was appropriate for plaintiff's excessive force claim. *Gilles v. Davis*, 427 F.3d 197, 208 (3d Cir. 2005). Based on this record, Plaintiff cannot sustain an excessive force claim.

While being restrained as an innocent bystander to the events of the day was understandably upsetting and humiliating to Plaintiff, after all inferences here drawn in favor of Plaintiff to the extent supportable by the record, Defendants' use of force was objectively reasonable under the circumstances. Therefore, the Court must grant summary judgment.

### iv.  Failure to Intervene

Generally, for a plaintiff to demonstrate an officer's liability for failing to intervene, an underlying constitutional right must have been violated, the officer must have had a duty to intervene, and the officer must have had a realistic and reasonable opportunity to intervene. *White v. City of Vineland*, 500 F. Supp. 3d. 295, 305-06 (D.N.J. 2020). At summary judgment, all a plaintiff must demonstrate is that an officer was in the vicinity when a constitutional violation occurred in order to show an opportunity to intervene. *Id.* at 306. Failure to intervene in relation to a claim of excessive force is more precise: the duration of the incident is key to determining whether there was a reasonable opportunity to intervene, however the opportunity is not in relation to duration of the entire incident but to the specific instance of where the use of force was applied. *Stabile*, 2023 U.S. Dist. LEXIS 147040 at *9.

It is unclear from Plaintiff's briefing if she is alleging a failure to intervene on her improper search and seizure claim or her excessive force claim. However, because the Court has found the Defendants' use of force was objectively reasonable under the circumstances of this case, the Court

must also grant summary judgment on Plaintiff's failure to intervene claims having also found that there is no underlying constitutional violation.

### v. Qualified Immunity

While the Court believes that Defendants had probable cause in this case, it is important to note that pursuant § 1983, even if probable cause did not exist, the Court finds that Defendants are entitled to qualified immunity. *Lucia*, 2014 WL 1767527 at \*4 (D.N.J. May 2, 2014) (quoting *Wildoner*, 162 N.J. at 385). Because "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and [the Supreme Court has] indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Government officials performing discretionary functions are generally shielded from liability for civil damages when their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known at the time. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Two kinds of immunity can apply to those sued in their personal capacity under §1983: absolute immunity and qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).

Here, CCPO Defendants' conduct would be considered investigative and thus will be analyzed under the qualified immunity standard. While a prosecutor's absolute immunity can apply to investigators for certain kinds of conduct intimately associated with the judicial phase of the criminal process, strictly investigatory conduct does not enjoy absolute immunity. *See Fogle v. Sokol*, 957 F.3d 148, 1690-63 (3d Cir. 2020) ("Determining the precise function that a prosecutor is performing is a fact-specific analysis. For instance, a prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested. Before probable

35

cause for an arrest, a prosecutor's mission at that time is entirely investigative in character. . . [However] [e]ven after that determination, . . . a prosecutor may engage in police investigative work that is entitled to only qualified immunity.") (internal citations and quotations omitted). For example, in *Fogle*, the Third Circuit found that when the prosecutor was involved with a witness interview, it was considered investigatory because although interviewing witnesses can often be seen as prosecutorial in function, to prepare for trial, this interview fell outside of the prosecutor's role as advocate because it "occurred at the end of a long chain of investigative events led, or supervised, by [the prosecutor]. . . [the prosecutor] was investigating the theory of his case by 'searching for . . . clues.'" *Fogle*, 957 F.3d at 163. CCPO Defendant Miller's conduct here was similarly investigatory: observing drug buys, surveillance of the home of the target, and preparing a search warrant to find evidence of drug activity. Thus, all Defendants will be subject to the qualified immunity standard.

The Court notes at the outset that the qualified immunity analysis is an objective analysis, the officers' subjective beliefs about the existence of probable cause are irrelevant, but the Court must remain sensitive to the "broad range of reasonable professional judgment accorded to law enforcement" in the § 1983 context: effectively, the qualified immunity doctrine "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *See Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000).

With regard to CHPD and CCSO Defendants, these officers are entitled to qualified immunity for the reasons discussed in section ii. Unlawful Search, *supra*. To state simply, the question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," and in this case CHPD and CCSO Defendants did not contribute nor did they know about 308 Walnut Avenue being a duplex. *Roberson v. Borough of Glassboro*, 570 F.

Supp. 3d 221, 231 (D.N.J. 2021). Thus, it was reasonable that the CHPD and CCSO Defendants proceeded to execute the facially valid warrant on the entire premises of 308 Walnut Avenue and detained Plaintiff for the duration of the search pursuant to that warrant.

It is a closer call with regard to CCPO Defendant Miller's conduct in researching the status of 308 Walnut Avenue. As the Court noted in section ii. Unlawful Search, *supra*, the question is whether CCPO Defendant Miller's mistake was reasonable, or if his conduct falls into the category of plainly incompetent. Again, *Franks v. Delaware*, is instructive. When discussing the issue of "mistake" in relation to the affidavit supporting the search warrant, the *Franks* Court was careful to excise "[a]llegations of negligence or innocent mistake" as "insufficient" and require a court to find "deliberate falsity or reckless disregard" of the affiant. *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978); *see also Int'l Islamic Cmty. of Majid Baytulkahliq v. United States*, 981 F. Supp. 352, 368 (D.V.I. 1997) ("Where the judicial finding of probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth, not only does the search violate the Fourth Amendment, but the officer will not be entitled to a good faith or qualified immunity. . . The *Franks* Court carefully excluded police negligence in checking or recording facts relevant to a probable cause determination from the embrace of the rule.") (internal citations omitted). Here, the Court has scrupulously reviewed CCPO Defendant Miller's actions and the information he had at his disposal, and given the fact that there were a multiplicity of facts to suggest the probability that 308 Walnut Avenue was a single dwelling, and that he believed that the NJ Parcels.com website pulled information from governmental tax websites, with its use being his supervisor's suggestion, the website's own averment that its records are pulled from "public sources," and the fact that it was CCPO Defendant Miller's second time writing a warrant, (Pl.'s Opp. to CCPO Motion to S.J. at Ex. 2, 15:1-6), the

Court finds that CCPO Defendant Miller's assertion that the information came from the New Jersey Department of Taxation was wrong and a mistake, rather than a deliberate or reckless falsehood. To call it a mistake is not to minimize Defendant CCPO Defendant Miller's actions: his choices have had significant consequences, not only causing Plaintiff significant distress and emotional turmoil, but years of litigation. However, the Court cannot find in his actions the level of indifference and deliberateness required to overcome his qualified immunity.

### vi.  Punitive Damages Claim Pursuant to § 1983

Punitive damages are available pursuant to § 1983 only against individual defendants in their individual capacity "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Coleman v. Kaye*, 87 F.3d 1491 (3d Cir. 2014) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)); *see also Falco v. Zimmer*, (Dec. 28, 2020) (collecting cases showing municipalities individuals sued in their official capacity are immune from punitive damages pursuant to § 1983).[16] The Third Circuit has held that "reckless indifference" in this context is focused on the defendant's knowledge that he or she "may be acting in violation of federal law." *Santa Maria v. City of Elizabeth (N.J.)*, No. 15-3243, 2018 WL 4110927 at *8 (D.N.J. Aug. 28, 2018).

Here, Plaintiff does not point to any material facts that show an evil motive or intent, nor any action that was done with reckless or callous indifference.[17]  The Court discussed at length

---

[16] Therefore, to the extent that Plaintiff alleges punitive damages against the CCPO, CCSO, and CHPD as entities, summary judgment is granted against those claims.

[17] While Plaintiff points to various elements about the premises and argues that the presence of the two utility meters (which the parties debate as to their visibility), different doors in different styles, the presence of two mailboxes, and the absence of an internal staircase, should have made Defendants aware that the premises was a duplex, the Court does not find these elements strong enough to support an assertion of that knowledge on behalf of the Defendants, especially in the context of executing a no-knock search warrant in the early hours of the morning. In relation to the preparation of the search warrant, Plaintiff points to the NJ Parcels website that possibly indicated more than one internet provider and indicated Plaintiff as a registered voter at the premises, the Court does not find any of these pieces of information, even if true, to be strong enough to support an assertion of knowledge that 308 Walnut Avenue was a duplex on behalf of CCPO Defendant Miller.

above, and so will not rehash the details here, about how the CCSO and CHPD Defendants behaved in an objectively reasonable manner given the circumstances presented to them on February 28, 2020. With regard to the CCPO Defendants it could be argued, specifically CCPO Defendant Miller in his research into the status of 308 Walnut Avenue, was negligent: that a more thorough examination of the property should have been done; that it was inappropriate that additional, more authoritative resources were not used in research about the property; that CCPO Defendant Miller should not have relied on a supervisor's instruction that the website NJ Parcels would be a trustworthy source sufficient for such a significant investigative step as a search warrant. CCPO SMF ¶¶ 19-22. However, a defendant who is merely negligent or even grossly negligent may not be subjected to punitive damages. *Frohner v. City of Wildwood*, No. 7-1174, 2008 WL 5102460 at *10 (D.N.J. Dec. 1, 2008). The CCPO Defendants' behavior, such as possibly lack of experience or diligence, in preparing and revising the no-knock warrant, appears negligent, it stands in clear contrast to the types of situations that demonstrate evil motive or reckless indifference. *See DiLoreto v. Oaklyn*, 744 F. Supp. 610, 624 (D.N.J. 1990) (holding that evidence showing a police officer performing a strip search on a detainee for no other reason than the fact she was a woman demonstrates sufficient evidence to support punitive damages); *Whichard v. Willingboro Twp.*, No. 13-3606, 2015 WL 5054953 at *11 (D.N.J. Aug. 26, 2015) (holding that evidence showing a police officer shot plaintiff in the back as he lay prone on the floor, posing no threat to officers, demonstrated reckless indifference sufficient to support punitive damages); *Frohner*, 2008 WL 5102460 at *11 (holding that officers' refusal to adjust plaintiff's handcuffs after plaintiff stated that the handcuffs were too tight and injuring his wrists when plaintiff was not struggling, demonstrated reckless indifference sufficient to support punitive damages).

Therefore, the Court does not find that the actions of the CCSO, CHPD, and CCPO Defendants show evil intent, nor do they amount to reckless or callous indifference to federal rights and thus are not liable for punitive damages as a matter of law.

## V.     State Law Claims and the New Jersey Tort Claims Act

### i.   Immunity Pursuant to N.J.S.A. 59:3-3

Plaintiff assets additional claims against Defendants under New Jersey state law for the torts of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence the CCSO Defendants, the CCPO Defendants, and Defendant Harmon of the CHPD. The New Jersey Tort Claims Act ("NJTCA"), N.J.S.A. § 59:1-1 to 12-3, provides for the liability of tort claims against public employees and states in pertinent part: "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law.  Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."  N.J.S.A. § 59:3-3.  The standard to determine if a public employee was acting in "good faith" is the same standard used to assess "objective reasonableness" in relation to the application of qualified immunity pursuant to § 1983. *See Castro v. New Jersey*, 521 F. Supp. 3d 509, 525 (D.N.J. 2021).

Additionally, the "immunity" provided by N.J.S.A. 59:3-3 is not applicable in situations where a public employee is found to have engaged in "willful misconduct." N.J.S.A. § 59:3-14(a). Willful conduct is "the commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden . . . . [I]t requires much more than an absence of good faith and much more than negligence." *Castro*, 521 F. Supp. 3d. at 525 (quoting *PBA Local No. 38 v. Woodbridge Police Dep't,*, 832 F. Supp. 808, 830 (D.N.J. 1993)).

The individual CCSO and CPHD Defendant Harmon assert that Plaintiff's state law tort claims fail as a matter of law pursuant to the N.J.S.A. § 59:3-3.  The Court agrees.  As discussed

40

above, the standard to determine if a public employee was acting in "good faith" is the same standard used to assess "objective reasonableness," and the Court has found that the CCSO and CHPD Defendants are entitled to qualified immunity for their actions in preparing and executing the no-knock search warrant. *See Castro v. New Jersey*, 521 F. Supp. 3d 509, 525 (D.N.J. 2021).

Here, the Court notes that CHPD Defendant Harmon provided the information from the controlled buys he coordinated to CCPO Defendant Miller, who prepared the search warrant. CHPD SMF ¶¶ 7-10. He signed the affidavit of probable cause with good faith: he had no knowledge of any errors in the search warrant materials or reason to question CCPO Defendant Miller's contributions to same. CHPD SMF ¶ 42. There are no facts to suggest that CHPD Defendant Harmon had a duty to second guess or check CCPO Defendant Miller's work. CHPD Motion for S.J. at 28, 35. Further, Detective Harmon took no part in the decision for the CCSO Defendants to enter the second floor. CHPD SMF ¶ 104; CCSO SMF ¶ 27

As discussed above, the CCSO Defendants and other personnel that day did not have definitive proof from their surroundings that the second floor was a separate unit, and in the circumstances of a fast paced, no-knock search warrant execution against a potentially dangerous target, it was objectively reasonable that once the CCSO Defendants were told they had permission to search the entire property that they would enter the second floor. CCSO SMF ¶¶ 26, 27; CHPD SMF ¶¶ 25, 28 34. The CCSO Defendants believed in good faith that the search warrant gave them the legal permission to enter the second floor of the premises, and once inside they followed their standard protocols to secure the building for the investigating agencies to conduct their search. CCSO SMF ¶¶ 30, 43-47.

While Plaintiff argues that the officers engaged in "willful, wanton action, [with] malicious intent," simply asserting these phrases in briefing does not make it so. Pl.'s Opp. to CHPD Motion

for S.J. at 9. There is nothing in the record that indicates to this Court that the CCSO Defendants'
decision to enter Plaintiff's unit stemmed from them being "angry or frustrated" that they had not
found the target on the first floor, and even if it were true, such a showing would fall short of
demonstrating willful conduct which "requires much more than an absence of good faith and much
more than negligence," *Id.* Plaintiff has not pointed to any material fact that shows the Court that
the CCSO or CHPD Defendants had any actual knowledge that entering the second floor unit was
forbidden. *Castro*, 521 F. Supp. 3d. at 525. Thus, Plaintiff does not meet the bar to strip the CCSO
or CHPD Defendants of immunity pursuant to N.J.S.A. 59:3-14(a).

Therefore, the Court finds that N.J.S.A. § 59:3-3 precludes the CCSO Defendants and
CHPD Defendants' liability.

### ii. Notice

Further, the CCPO Defendants assert that Plaintiff failed to comply with the notice
requirements of the NJTCA, namely that they did not send a tort claim and that if one was sent, it
was not in compliance with N.J.S.A. § 59:8-10a. Plaintiff submits that she has complied with the
requirements of the NJTCA and provides the Court with a letter dated June 1, 2020, with the title
"AMENDMENT TO MAY 22, 2020 TORT CLAIMS NOTICE PURSUANT TO N.J.S.A. 59:8-
4," amending to include the CCPO, and includes a signed certified mail return receipt addressed
to the CCPO that is undated. Pl.'s Opp. to CCPO Motion for S.J., Ex. 21.

"To maintain an action against a public entity or public employee, a plaintiff must file a
notice of claim with either the State Attorney General or with 'the department or agency involved
in the alleged wrongful act or omission,' N.J.S.A. § 59:8-7, within 90 days of the accrual of the
cause of action. N.J.S.A. 59:8-8." *Gaston v. New Jersey*, 298 Fed. App'x 165, 167-68 (3d Cir.
2008). Failure to follow the required notice procedure will result in dismissal of the tort claims

with limited exceptions. *Id.*[18]  N.J.S.A. § 59:8-10a requires that the claim be "presented to the public entity by delivering it to or mailing it certified mail to the office of the Attorney General or the office of the State agency allegedly involved in the action." For the Court to assess a notice of claim's timeliness, it must undertake a sequential analysis to determine: 1) the date when the claim accrued, 2) whether a notice of claim was filed within ninety days of that date, and 3) if the notice is untimely, whether extraordinary circumstances justify filing a late notice. *Est. of Khiev v. S. Jersey Transp. Auth.*, No. A-0620-22, 2024 WL 607735 at *3 (Feb. 14, 2024).

Plaintiff's tort occurred on February 28, 2020, which is the date from which accrual began. N.J.S.A § 59:8-1, ("[a]ccrual shall mean the date on which the claim accrued.")[19]  Thus, Plaintiff was required to file her tort claim by May 28, 2020.  On its face, the letter Plaintiff presents as her notice of claim to the CCPO does not meet the ninety day requirement.  Pl.'s Opp. to CCPO Motion for S.J., Ex. 21.  Plaintiff has not made a motion for a late filing, nor has she presented any circumstances, much less extraordinary circumstances, to justify filing a late notice.  Therefore, the CCPO Defendants' Motion for Summary Judgment as to Plaintiff's NJTCA claims is granted.[20]

---

[18] The NJTCA requires Plaintiff follow a notice procedure that cannot be tolled beyond one year from the accrual of the claim and file suit within two years of accrual of the claim. N.J.S.A § 59:8-3, -8, -9. A District Court has discretion to allow a filing of a late Notice of Claim if made within one year of the claim accrual date if the late claimant shows "extraordinary circumstances" caused the failure to timely file and that the defendants are not substantially prejudiced from such a late filing. *See Green v. County of Gloucester*, No. 7-2962, 2008 WL 3154733 at *2 (D.N.J. Aug. 4, 2008); N.J.S.A. § 59:8-9. Otherwise, a claimant "shall be forever barred from recovering." *Id.* at *3.

[19] New Jersey law recognizes two situations that impact claim accrual: a claim can begin to accrue on the date when the tortious act occurred, or on the date when the victim becomes aware that the injury was from a third party, also known as the "discovery rule." The discovery rule can be invoked when "the facts present would alert a reasonable person, exercising ordinary diligence, that [they] were injured due to the fault of another." *See Est. of Khiev v. S. Jersey Transp. Auth.*, No. A-0620-22, 2024 WL 607735 at *3-4 (Feb. 14, 2024) (internal citations omitted). Plaintiff, however, has not invoked the discovery rule to assert that her June 1, 2022, notice was timely under the ninety day requirement.

[20] Because the Court has found in favor of the CCPO Defendants' regarding Plaintiff's NJTCA claims, the Court need not address CCPO Defendants' argument regarding Plaintiff's non-economic damages.

### iii.  Punitive Damages

Punitive damages cannot be brought against municipalities for state law causes of action under the NJTCA but can be brought against individual public employees.  *See* N.J.S.A. § 59:9-2(c).  However, as the Court has discussed at length, because the individual CHPD and CCSO Defendants are immune from liability pursuant to N.J.S.A. § 59:3-3, and both the CCPO and the individual CCPO Defendants were not properly notified of claims against them, punitive damages cannot be applied pursuant to the NJTCA.  Finally, because the Court has determined that the individual Defendants in this matter are not liable, the Defendant entities cannot be held liable under a theory of *respondeat superior*.  *See* N.J.S.A. § 59:2-2(b) ("A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable.").  Summary judgment must be granted for all Defendants regarding state law punitive damages.[21]

---

[21] Given the outcome of the Court's Opinion, the issue of whether Mr. Yarbaugh should be permitted to testify as an expert is moot.

## VI.    CONCLUSION[22]

For the reasons set forth above, Defendant Higgin's Motion for Summary Judgment (ECF No. 62) is denied, CCSO Defendants' Motion for Summary Judgment (ECF No. 63) is granted, CCPO Defendants' Motion for Summary Judgment (ECF No. 64) is granted, and CHPD Defendants' Motion for Summary Judgment (ECF No. 65) is granted.  An order consistent with this Opinion will be entered.

March 28, 2024

KAREN M. WILLIAMS, U.S.D.J.

---

[22] Plaintiff also describes an incident that occurred approximately one week after the search warrant was executed on her apartment where she encountered CCSO Defendant Wright at a local bar.  Pl. Opp. CCSO SMF ¶¶ 89-92. Plaintiff alleges he apologized to her, made inappropriate comments to and about her, and put his hand on her thigh. *Id.*  She further alleges that approximately two weeks later several officers who were present at the execution of the search warrant came back to her apartment to serve another warrant on the original target, which caused her further emotional upset. Pl. Opp. CCSO SMF ¶¶ 94-97.  The return of several Defendants to serve a warrant several weeks later is part and parcel of their investigative and prosecutorial roles, and thus qualified immunity applies.  The Court finds the conduct of CCSO Defendant Wright disturbing; however he was not acting under the color of law when he spoke to Plaintiff at a bar.  The route to redress for Defendant Wright's inappropriate and uncouth off duty behavior lays in the hands of Internal Affairs at the CCSO, wherein the Court hopes that sufficient action has been taken to ensure that all CCSO employees understand their obligation to exhibit the standard of behavior expected of those that hold their position of authority in the community, even when they are not on duty.